UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| COMMERCIAL METALS COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:09-CV-0808-B |
| | § | |
| MARK CHAZANOW, MICHAEL | § | |
| UHRICK, MARK WAYNE, and MI 3 | § | |
| TRANSPORT, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are (1) the Motion of Defendants Mark Chazanow, Michael Uhrick, and Mark Wayne ("Individual Defendants") to dismiss Plaintiff Commercial Metals Company's ("CMC") RICO and RICO conspiracy claims (doc. 5), and (2) the Motion of Defendant MI 3 Transport, LLC ("MI") that adopts and incorporates the Motion of the Individual Defendants and seeks the same relief. (doc. 7). For the reasons that follow, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss.

I.

FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff CMC is a public corporation based in Irving, Texas that "manufactures, recycles, and markets steel and metal products and related materials" worldwide. (doc. 1 ¶ 1). The events giving rise to this dispute followed CMC's 2006 purchase of Yonack Iron & Metal Co. ("Yonack") and its

---

[1] The Court takes its factual account from Plaintiff's Original Complaint (doc. 1). *Martin K Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (stating that in deciding a motion to dismiss, all well-pleaded factual allegations are taken as true).

wholly owned subsidiary, Metallic Industries, LLC ("Metallic"). (*Id.* at ¶ 2). The Agreement for the Purchase and Sale of Assets ("APSA"), called for CMC to acquire substantially all of the assets of Yonack and Metallic. (*Id.* at ¶¶ 3, 25, 27). The APSA additionally required Individual Defendants Chazanow and Uhrick to accept employment with CMC, and each executed an employment agreement along those lines on June 7, 2006. (*Id* at ¶¶ 40-42, 45-46).

While negotiating the APSA, the parties discussed the possibility of including the sale of MI in the transaction. MI, a transportation company partly owned by Yonack and the Individual Defendants, had provided transportation and trucking services to Metallic. (*Id.* at ¶ 32). Opting instead to rely on its own transportation fleet, CMC declined to purchase MI and instructed Yonack and the Individual Defendants to divest their ownership of MI to avoid any conflicts of interest that could result from interest in a potential competitor. (*Id.* at ¶¶ 8, 32). Each informed CMC that he had complied and divested ownership in MI. (*Id.* at ¶ 8).

Each of the Individual Defendants worked for one of the acquired entities prior to the APSA and assumed management positions with CMC afterwards. Prior to the execution of the APSA, Chazanow was president of Metallic. (*Id.* at ¶ 33). On June 7, 2006, simultaneously with the execution of the APSA, Chazanow executed a three year employment agreement and accepted a position as CMC Recycling's Marketing Coordinator for the North Texas Region. (*Id.* at ¶ 4). Uhrick was a Vice President of Yonack prior to the APSA and, also on June 7, 2006, executed an employment agreement with CMC, becoming CMC Recycling's North Texas/South Texas Operations Manager. (*Id.* at ¶ 35). Wayne was an employee at Metallic, working under Chazanow, prior to the execution of the APSA. In November 2006, he signed an employment agreement and joined CMC, where he ultimately became the manager of the American yard for CMC. (*Id.* at ¶¶43,

34).

The Individual Defendants' employment agreements with CMC included similar noncompete clauses prohibiting them from competing directly or indirectly with CMC during their employment and for a specified period following employment with CMC. (*Id.* at ¶¶ 30, 41, 43, 45). CMC alleges that instead of divesting their interest in MI as directed, the Individual Defendants either retained their ownership of MI or maintained a beneficial interest and association with MI despite ostensible transfer of ownership to their respective wives.[2] (*Id.* at ¶¶ 32-34, 38; doc. 10 p. 13-14). CMC also asserts that it required its employees to annually certify compliance with ethics policies and to disclose any potential conflicts. (*Id.* at ¶¶ 49-52). CMC further alleges that each of the Individual Defendants "failed to disclose his continued involvement with MI to CMC and, in fact, affirmatively represented that neither he nor members of his household had involvement with any 'supplier of . . . services' to CMC." (*Id.*).

CMC alleges that shortly after joining CMC in 2006, the Individual Defendants "began a scheme to defraud CMC by directing substantial business to MI, the company allegedly owned by their spouses, for their direct benefit." (*Id.* at ¶ 53). Through this scheme, the Individual Defendants allegedly concealed their interest in MI3, used their positions at CMC to employ MI instead of CMC's trucking fleet, and approved MI's fraudulent or overstated invoices. (*Id.* at ¶ 53-55). CMC alleges that the scheme, lasting from June 2006 through February 2009 resulted in payments to MI3 of over $3 million, many of which were made outside the ordinary course of CMC's

---

[2] It is not clear whether CMC alleges that these purported transfers of ownership was invalid or that the transfers did not occur. Whatever issues CMC has with the transfers, it clearly concluded and alleges that MI was "owned or controlled by" the Individual Defendants. (*See, e.g., id.* at ¶ 67).

-3-

payment process. (*Id.* at ¶¶ 11, 58). Specifically, CMC alleges that Chazanow "directed the use of MI for all former Yonack customers." (*Id.* at ¶ 55, 72). CMC further contends that "Chazanow and Wayne required and approved the use of MI and directed business to MI over other available trucking services." (*Id.*).

According to CMC, several employees questioned "the excessiveness of the MI charges and the lack of necessity of certain charges." (*Id.* at ¶ 56). CMC found "disturbing inconsistencies in MI's invoicing," and directed its audit staff to investigate MI's activities. (*Id.* at ¶ 59). CMC's initial audit revealed "that MI grossly overcharged CMC for services, improperly charged CMC for services that were neither necessary nor requested, and charged CMC for services that, in some cases, were never provided." (*Id.* at ¶ 11). CMC then attempted to determine "whether Chazanow, Uhrick, and Wayne actually owned MI and the extend to which the employees had directed CMC's business to MI." (*Id.* at 13). CMC concluded that the Individual Defendants did not divest their ownership as represented, and did not disclose the interests purportedly transferred to their spouses. (*Id.* at ¶ 13-15).

As a result of this scheme, CMC alleges that it made at least 618 payments to MI between June 2006 and December 2008, and that it conducted these transactions "through the mail, e-mail, facsimile, wire transmissions, telephones, and text messages." (*Id.* at ¶¶ 58-60). CMC attached to its complaint invoices and corresponding payments that it contends its audit revealed to be evidence the scheme. (*Id.* at ¶¶ 78, 81-82; Exhibits E through H). CMC terminated Individual Defendants Chanazow and Wayne on January 29, 2009, and in February 2009 informed MI that it would no longer utilize its services. (doc. 6 p. 5).

Plaintiff CMC filed suit on April 30, 2009, claiming that the Individual Defendants, while

-4-

employed by CMC, engaged in a scheme, through their wholly owned entity (and alleged RICO enterprise), MI 3 Transport, to fraudulently overcharge CMC and to collect money from CMC for services that were not requested or necessary. (doc. 1, p. 1-4; doc. 10, p. 1-3). CMC filed suit asserting claims for violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1062(c), alleging the Individual Defendants participated in a RICO enterprise through a pattern of racketeering activity that included mail fraud, wire fraud, and bank fraud. (doc. 1, p. 17-25). CMC also asserts a claim for RICO conspiracy, as well as claims under a variety of state law causes of action based on the same conduct. (*Id.* at p. 25-38). On June 30, 2009, the Individual Defendants filed their motion to dismiss (doc. 6), which was joined on July 2, 2009 by Defendant MI (doc. 7).

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K Eby Constr. Co. V. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). "A motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.'" *Tel-Phonic Servs., Inc. v. TBS Int'l., Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992) (quoting *Ward v. Hudnell*, 366 F.2d 247, 249 (5th Cir. 1966)). The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true (even if doubtful in fact)." *Id*. at 555. "[A] plaintiff's obligations to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. If the allegations raise no entitlement to relief, "this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuviller v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Tombly*, 550 U.S. at 557). The Court will not weigh the evidence or resolve competing factual assertions at the motion to dismiss stage. *See Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."). Instead, at this stage, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *At the Airport, LLC v. Isata, LLC*, 438 F.Supp.2d 55, 60 (E.D.N.Y. 2006).

## III.

## ANALYSIS

CMC alleges that Defendants "conducted, participated in, and/or conspired to conduct or participate in, directly or indirectly, the affairs of the MI Enterprise through a pattern of racketeering activity" in violation of the RICO statute, 18 U.S.C. § 1962(c) and (d). (doc. 1 ¶ 66). "Subsection 1962(c) prohibits persons employed by or associated with any enterprise from conducting or participating in the enterprise's affairs through a pattern of racketeering." *Word of Faith World Outreach Center Church, Inc.*, 90 F.3d 118, 121 (5th Cir. 1996). "Subsection 1962(d) prohibits a

-6-

conspiracy to violate 18 U.S.C. § 1962(a), (b), or (c)." *Id.* at 122.

To state a plausible RICO claim, CMC must allege facts to show "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *In re Burzynski*, 989 F.2d 733, 741-42 (5th Cir. 1993). A RICO "person" may be "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3); *St. Paul Mercury Ins. Co. V. Williamson*, 224 F.3d 425, 439 (5th Cir. 2000). A RICO person must be distinct from the RICO enterprise. *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007). "Racketeering activity" includes certain state and federal offenses enumerated in § 1961(1), including mail, wire, or bank fraud. *H.J. Inc. v. Nw. Bell Tell. Co.*, 492 U.S. 229, 239 (1989); *Word of Faith*, 90 F.3d at 122. To assert a claim based on a "pattern of racketeering activity, CMC must allege "that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." *Word of Faith*, 90 F.3d at 122 (quoting *H.J. Inc.*, 492 U.S. at 239). An "enterprise" is broadly defined by the Act, and it "can be either a legal entity or an association-in-fact."[3] *St. Paul Mercury Ins. Co.*, 224 F.3d at 440.

CMC alleged that Defendants Chazanow, Uhrick, and Wayne are RICO persons who engaged in a pattern of racketeering activity grounded in the predicate acts of mail fraud, wire fraud, and bank fraud. (doc. 1, ¶¶ 76-84). Because CMC has adequately plead the first element and sufficiently identified RICO persons, whether CMC's complaint can withstand a 12(b)(6) challenge will depend on the sufficiency of its allegations related to a pattern of racketeering activity and the

---

[3] CMC alleges that MI is a RICO enterprise as defined by 18 U.S.C. § 1961(4). (doc 1 ¶ 65). In the alternative, CMC alleges that the Individual Defendants formed an association-in-fact enterprise. (*Id.* at ¶ 71).

existence of a RICO enterprise.

  A.  *Sufficiency of Allegations for Predicate Acts*

  CMC RICO claims are grounded in the alleged predicate acts of mail fraud, wire fraud, and bank fraud. Defendants argue that CMC's claims must fail because it has not sufficiently plead facts to support the fraud-based predicate acts that form the foundation for its RICO claims.

  Rule 9(b) provides "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b); *Coates v. Heartland Wireless Comms., Inc.*, 26 F.Supp.2d 910, 914 (N.D. Tex. 1998). Because "Rule 9(b)'s particularity requirement applies to pleading fraud as a predicate act in a RICO claim," CMC must meet the heightened standard of pleading when alleging these fraud-based predicate acts. *Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F.Supp. 995, 1004 (S.D. Tex. 1995 (citing *Tel-Phonic Servs. Inc. v. TBS Int'l. Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992)). "To satisfy Rule 9(b), a plaintiff must at a minimum allege the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Bonton*, 889 F. Supp. At 1004 (quoting *Tel-Phonic Servs. Inc.*, 975 F.2d at 1139)). Where, as here, multiple defendants are alleged to have contributed to the fraudulent predicate acts, a "plaintiff must 'plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant; the plaintiff is obligated to 'distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud.'" *Coates*, 26 F.Supp.2d at 915 (quoting *In re Silicon Graphics, Inc. Secs. Litig.*, 970 F.Supp. 746, 752 (N.D. Cal. 1997)).

  Though this burden requires specificity, a "complainant need not, however, state all facts pertinent to a case to satisfy the requirements of Rule 9(b)." *Mitchell energy Corp. V. Martin*, 616

F.Supp. 924, 927 (S.D. Tex. 1985). "Rule 9(b) does not 'reflect a subscription to fact pleading' and requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *United States v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)). In alleging RICO scheme involving mail or wire fraud, it is not necessary to assert that each defendant personally made fraudulent mailings or wires; rather "Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud." *At the Airport*, 438 F.Supp.2d at 61. Where a "plaintiff claims that mail and wire fraud were in furtherance of a larger scheme to defraud . . . Rule 9(b) 'only requires the plaintiff to delineate, with adequate particularity, the specific circumstances constituting the overall fraudulent scheme.'" *Id.*

Here, CMC alleges that the Individual Defendants participated in a scheme by which they used their positions with CMC to direct business to MI and approve fraudulent invoices. (doc. 1 p. 1-4). To satisfy the requirements of Rule 9(b), CMC must both describe the allegedly fraudulent statements with particularity and sufficiently apprise each defendant of his role in the alleged scheme. CMC contends that "[f]rom June 2006 to December 2008, CMC made at least 618 payments to MI for a total of $3,152,835.17. From CMC's initial audit of those payments, (I) CMC was grossly overcharged for the services that MI allegedly performed, (ii) CMC was charged for services that were neither necessary nor requested, and (iii) in several cases, CMC was improperly charged for services that were neither requested nor performed." (doc. 1 ¶ 58). As Exhibit E to its complaint, CMC attached a series of dated invoices, each sent from MI, that it contended to be fraudulent or overstated as described in the body of its complaint. CMC further alleges that, in addition to their actions through MI, each of the Individual Defendants contributed to the

fraudulent scheme by directing legitimate business to MI, approving MI's invoices, and concealing their interest in MI. (doc 1 ¶¶ 53-58, 67-68). CMC contends that "Defendants Chazanow, Wayne, and Uhrick operated the MI Enterprise for the purpose of diverting profits and business opportunities from CMC to a company owned or controlled by them." (*Id.* at ¶ 67).

Defendants argue that CMC's averments of mail and wire fraud are not stated with sufficient particularity. They contend that "Plaintiff never identifies any specific misrepresentations contained in any of" the documents attached to the complaint. (doc. 6, p. 10). Defendants further argue that CMC did not sufficiently identify which of the alleged misrepresentations are attributable to each defendant, and that the Individual Defendants are not adequately apprised of their roles in the alleged scheme. (*Id.*).

The Court has reviewed the Complaint and finds that it's averments of mail fraud and wire fraud satisfy Rule 9(b). The Complaint specifies the time period during which the alleged frauds occurred (June 2006 - December 2008); the location of the misrepresentations (Dallas, Texas); the contents of the misrepresentations (specific invoices and corresponding payments attached); the responsibility for the misrepresentations (transmitted by MI at the direction of the Individual Defendants and approved by Chazanow and Wayne); and what was obtained through the misrepresentation (payments to MI on invoices that were inflated or that included unnecessary services). CMC also sufficiently apprised each defendant of his role in the alleged scheme. Each of the misrepresentations was allegedly sent by MI, and the Complaint describes the actions taken by the Individual Defendants to direct business to MI, approve the invoices at issue, and conceal their

interest in MI. To adequately state a cause of action for the predicates of mail fraud[4], the plaintiff need not tie each defendant to each offensive mailing, but "must only present enough evidence to connect the defendant to the fraudulent scheme involving the use of the mails." *Cadle Co.*, 779 F.Supp. at 399. CMC further alleges that, in support of the enterprise, each Individual Defendant made additional misrepresentations about his ownership of or control of MI, both prior to the closing of the APSA and when annually certifying his compliance with CMC's ethics policy. The Complaint pleads facts sufficient to meet the requirements of Rule 9(b) and contains "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. CMC will have the burden of presenting evidence to support each of the above critical facts alleged in its complaint; however, at this stage, CMC's allegations must be taken as true. Because CMC has properly described the allegedly fraudulent statements and the role of each defendant in the alleged scheme, dismissal of CMC's RICO claims for failure to plead the predicate acts of mail fraud and wire fraud under Rule 12(b)(6) is not appropriate. The Court DENIES Defendants' Motions to Dismiss CMC's complaint on the asserted ground that it insufficiently pleads the predicate acts of mail fraud or wire fraud.

CMC additionally alleges that the scheme described above constitutes predicate acts of bank fraud in violation of 18 U.S.C. § 1344. (doc. 1, ¶ 84). To support its bank fraud claims, CMC alleges that "[b]y mailing and transmitting the invoices described in Paragraphs 78 and 81-82 above, Defendants caused CMC to remit checks to Defendants, as described in Paragraph 79 above. By doing so, Defendants knowingly executed a scheme or artifice to obtain monies, funds, credits,

---

[4] "The elements necessary to establish violations of the mail and wire fraud statutes are essentially identical; hence, courts apply identical analyses to both the mail and wire fraud statutes." *Cadle Co. V. Schultz*, 779 F.Supp. 392, 399 n. 37 (N.D. Tex. 1991) (citing *Carpenter v. United States*, 484 U.S. 19, 25 n. 6 (1987)).

-11-

assets, securities, or other property owned by, or under the custody or control of, a financial institution." (*Id.*). The predicate acts of bank fraud are thus grounded in allegations that Defendants presented CMC with fraudulent invoices that CMC paid with funds maintained at a financial institution. This allegation fails as a matter of law because "[i]t is the financial institution itself . . . that is the victim of the fraud the statute proscribes." *United States. v. Saks*, 964 F.2d 1514, 1518 (5th Cir. 1992) (citing *United States v. Blackmon*, 839 F.2d 900, 904-906 (2d Cir. 1988)). Here, CMC does not plead facts that indicate a financial institution, as opposed to a client of a financial institution (itself) was defrauded. CMC admits that Defendants "caused CMC to remit checks" and does not allege that the money was fraudulently withdrawn or that any misrepresentations were made to a financial institution. (doc. 1, ¶ 84). Instead, CMC alleges that it remitted checks to pay invoices it contends to be fraudulent. CMC simply has not alleged that the financial institution was the victim of any fraud, or even that any fraudulent statement was made to the financial institution. *Compare United States v. Hubbard*, 889 F.2d 277, 280 (D.C. Cir. 1989) (bank fraud properly alleged where defendant stole check from bank) *with United States v. Blackmon*, 839 F.2d 900, 904-905 (bank fraud not properly alleged where money was legally withdrawn from bank by a customer who was defrauded). Accordingly, CMC has not stated a claim for the predicate acts of bank fraud, and the Court GRANTS Defendants' Motions in part. All claims dependent upon allegations of bank fraud are DISMISSED.

    B.    *Pattern of Racketeering Activity*

In addition to sufficient pleading of predicate acts, to satisfy the second RICO element CMC must allege a "pattern" of such acts. *In re Burzynski*, 989 F.2d at 742. "'Racketeering Activity' consists of two or more predicate offenses, defined by the statute to include acts violating federal

wire or mail fraud statutes." *Word of Faith*, 90 F.3d at 122 (quoting 18 U.S.C. § 1961). This two-pronged element "requires the plaintiff to plead both that the predicate acts are related to each other and that they either constitute or threaten long-term criminal activity." *In re Burzynski*, 989 F.2d at 742 (citing *H.J. Inc.*, 492 U.S. at 239). "It is this factor of *continuity plus relationship* which combines to produce a pattern." *H.J. Inc.*, 492 U.S. at 239 (emphasis in original).

Predicate acts are related where the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.*; *Word of Faith*, 90 F.3d at 122. CMC alleges a series of similar predicate acts of mail and wire fraud regularly conducted through the MI enterprise that, as alleged, are not isolated or sporadic events. Thus, CMC has adequately pleaded that the predicate acts are related.

It is not enough that the alleged predicate acts be related; for a series of related predicate acts to constitute a RICO "pattern of activity," Plaintiff must also allege that the conduct was sufficiently continuous. "It is 'continuity' that assures a federal cause of action." *In re Burzynski*, 989 F.2d at 742. Continuity may be alleged as "either a closed period of repeated conduct, or an open-ended period of conduct that 'by its nature projects into the future with a threat of repetition.'" *Word of Faith*, 90 F.3d at 122 (quoting *H.J. Inc.,* 492 U.S. at 240). A closed period of conduct may be properly pleaded by alleging "a series of related predicates extending over a substantial period of time." *Id* (citing *H.J. Inc.*, 492 U.S. at 241). An open period of conduct requires allegations of "a specific threat of repetition extending indefinitely into the future," or that "the predicates are a regular way of conducting defendant's ongoing legitimate business." *Id.* (citing *H.J. Inc.*, 492 U.S. at 242-43).

Defendants challenge CMC's allegations of continuity and contend that on the facts alleged, "[i]t is impossible to ascertain . . . when the alleged fraud actually began and ended." (doc. 6, p. 12). CMC argues that its Complaint properly alleges both "closed-ended and open-ended continuity." (doc. 10, p. 12). CMC alleges that the "pattern of racketeering activity began at least as early as June 7, 2006 and continued at least until MI's services were terminated in February 2009." (doc. 1, ¶ 78). In support of this contention, CMC attached invoices dated from October 2006 to October 2008 that it contends "provides at least the minimum time frame" during which the scheme operated. (doc. 10, p. 12). The Fifth Circuit has held that the continuity requirement, though related to fraudulent predicate acts, need not meet heightened pleading requirements. *Abraham*, 480 F.3d at 355-56. That CMC's Complaint does not firmly fix the dates of the alleged conduct is therefore not fatal. While there is no clear line delineating the point when a period of closed-ended conduct reaches a "substantial period of time," CMC's allegations – acts that continued for thirty two months – extend well beyond the periods of weeks or months that have been found to be inadequate. *H.J. Inc.*, 492 U.S. at 242. Further, the alleged acts are not "part and parcel of a single, otherwise lawful transaction" of the sort alleged in *Word of Faith*. 90 F.3d at 123. Accordingly, the Court finds that CMC alleged continuity sufficient, if proven, to show a pattern of racketeering activity and DENIES Defendants Motions to Dismiss on the asserted ground that the Complaint fails to allege a pattern of racketeering activity.[5]

---

[5] CMC also contends that its Complaint supports a finding of open-ended continuity. Open-ended continuity allows a plaintiff to bring a RICO action "before continuity can be established," and is based on the threat of future activity. *H.J. Inc.*, 492 U.S. at 242. Because CMC did not bring this action before sufficient time elapsed to show closed-ended continuity, the Court need not address this alternative.

C.   *RICO Enterprise*

Defendants contend that CMC has not alleged facts sufficient to show that MI is a RICO enterprise or that the Individual Defendants were employed by or associated with the alleged MI enterprise. (doc. 6, p. 13-16). "Congress gave the term 'enterprise' a very broad meaning." *United States v. Elliott*, 571 F.2d 880, 897 (5th Cir. 1978) (quoting *United States v. Hawes*, 529 F.2d 472, 479 (5th Cir. 1976)). Under the statute, "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A "RICO enterprise can be either a legal entity or an association-in-fact." *St. Paul Mercury ins. Co.*, 224 F.3d at 440. "If the alleged enterprise is an association-in-fact, the plaintiff must show evidence of an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure." *Id.* CMC alleges that MI is a "RICO Enterprise," and that the Individual Defendants are "RICO Persons." (doc. 1, ¶¶ 64-65). In the alternative, CMC alleges that the Individual Defendants formed an association-in-fact enterprise. (*Id.* at ¶ 71).

CMC's RICO claims are based upon 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Claims based on this provision require "that the RICO person be distinct from the RICO enterprise." *St. Paul Mercury Ins. Co.*, 224 F.3d at 445. Defendants contend that CMC has not plead facts sufficient to show that the Individual Defendants were "employed by or associated with" the alleged MI Enterprise. (doc. 6, p. 13; doc 13, p. 4).

The proscriptions of the RICO statute have a broad reach; the "RICO net is woven tightly

-15-

to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978). Yet while liability does not depend on a defendant's seniority or level of responsibility within the enterprise – he may indeed be a small fish – each defendant must "have some part in directing" the affairs of the enterprise, directly or indirectly. *Reeves v. Ernst & Young*, 507 U.S. 170, 179 (1993). The *Reeves* Court interpreted "the word 'conduct' to require some degree of direction and the word 'participate' to require some part in that direction," while making clear that the statute does not require "primary responsibility" or "significant control." *Id.*

CMC alleges that the Individual Defendants "were all employed by or associated with the MI Enterprise, and conducted its affairs through a pattern of racketeering activity" that included the acts of mail and wire fraud described above. (doc. 1, ¶¶ 67-69). CMC further argues that the Individual Defendants are "associated with" the MI Enterprise by virtue of their ownership interest in MI. (*Id.*; doc. 10 p. 15). Defendants respond that CMC's allegations of ownership and employment "are patently untrue," and assert that none of the Individual Defendants were ever employed by MI and that each divested his ownership interest. (doc. 6, p. 13).

The Court finds that, taking the facts contained in the Complaint as true, CMC has sufficiently alleged direct or indirect participation on the part of the Individual Defendants in the conduct of the MI Enterprise's affairs. The statute "makes clear that RICO liability is not limited to those with a formal position in the enterprise," and CMC has alleged facts the Individual Defendants had "some part in directing the enterprise's affairs." *Reeves*, 507 U.S. at 179. It is not necessary for the Individual Defendants to have managerial or operational control, or hold any formal position within MI. Rather, it is sufficient to allege, as CMC does, that each participated

indirectly in the conduct of MI Enterprise's affairs by directing business to MI and approving invoices sent by MI.

The Court further finds that CMC's alternative pleading that the Individual Defendants formed an association-in-fact enterprise satisfies the pleading requirements. "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 129 S.Ct. 2237, 2244 (2009). Here CMC alleged that the purpose of the Association-in-Fact Enterprise was to direct business opportunities and profits to an entity controlled or owned by the Individual Defendants. The relationships among those associated with the Enterprise-in-Fact need not involve "a hierarchical structure or 'chain of command.'" *Id.* CMC's allegations that the Individual Defendants collaborated regarding the scheme and were related through their common ownership of MI suffices. CMC's allegations that the Association-in-Fact's operation was "continuous" throughout the time frame alleged satisfies the longevity requirement. Thus, the Court DENIES Defendants' Motions to Dismiss on the asserted ground that the Complaint fails to allege a RICO enterprise.

    D.    *RICO Conspiracy*

Defendant also moves to dismiss CMC's Section 1962(d) claim for RICO conspiracy. A claim for RICO conspiracy must allege "three elements: (1) knowledge by the defendant of the essential nature of the conspiracy; (2) the defendant's objective manifestation of an agreement to participate in the conduct of the affairs of an enterprise, and (3) an overt act, which need not be a crime, in furtherance of the conspiracy." *Bonton*, 889 F.Supp. at 1005 (citing *United States v.*

*Sutherland*, 656 F.2d 1181, 1187 (5th Cir. 1981)). Defendants specifically challenge the sufficiency of CMC's pleading of "an agreement to commit the predicate acts." (doc. 6, p. 17). "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Tel Phonic Servs. Inc.*, 975 F.2d at 1140.

Defendants argue that CMC did not "allege specific facts underpinning this "agreement," such as which Defendants conspired, when the agreement to conspire took place, or any other specific details regarding the alleged conspiracy." (doc. 6, p. 17). To properly allege agreement, CMC must plead facts that indicate the Individual Defendants, by their "words or actions . . .objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes." *Elliott*, 571 F.2d at 903.

CMC alleges that the individual Defendants "collaborated to form and control MI" then "consciously agreed to commit, and ultimately did commit, predicate acts with knowledge that the predicate acts were part of a pattern of racketeering activity." (doc. 1, ¶¶ 90-92). CMC then delineates which acts it contends provide evidence of the completed predicate acts of mail and wire fraud.[6] (doc. 1 ¶¶ 94-101). Agreement may be alleged by pointing to words or actions, and CMC's complaint alleges the actions that it contends show the Individual Defendants objectively manifested their agreement. Accordingly, the Court finds that CMC has pleaded facts sufficient to make relief under Section 1962(d) plausible when taken as true, and dismissal of CMC's conspiracy claim at this stage is inappropriate. The Court DENIES Defendants Motions to Dismiss on the asserted ground

---

[6] CMC additionally alleges that predicate acts of bank fraud constitute evidence of agreement to commit the same. Because this Court dismissed CMC"s allegations of bank fraud, the accompanying claim for conspiracy to commit those acts is also dismissed. *See, e.g.*, *Bonton*, 889 F.Supp. at 1005).

that the Complaint fails to sufficiently allege a RICO conspiracy.

## IV. Conclusion

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendants' Motions to Dismiss. (doc. 5; doc. 7). The following claims are DISMISSED: (1) CMC's RICO claims based on predicate acts of bank fraud; and (2) CMC's RICO conspiracy claim based on agreement to commit predicate acts of bank fraud. Defendants' Motion to Dismiss is DENIED in all other respects.

**SO ORDERED**

**SIGNED: November 17, 2009**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE